434 So.2d 1203 (1983)
Raymond DAVENPORT
v.
George E. NIXON, et al.,
D/B/A Admiral Motel, et al.
No. 82 CA 0954.
Court of Appeal of Louisiana, First Circuit.
June 28, 1983.
Charles R. Moore, Baton Rouge, for plaintiff-appellee Raymond Davenport.
Myron A. Walker, Baton Rouge, for defendant-appellant George E. Nixon and Pearl C. Nixon, d/b/a Admiral Motel, et al.
Before LOTTINGER, COLE and CARTER, JJ.
COLE, Judge.
This is a suit ex delicto brought by a motel patron against the owners and insurer of a motel where he was viciously attacked and robbed by another motel guest following his late-night check-in. At issue is the liability of a business for the criminal act of a third person on the premises.
The incident from which this suit arose occurred on November 8, 1980 at the Admiral Motel on Airline Highway in Baton Rouge. Plaintiff, a 48 year old man who is partially paralyzed from two previous strokes, arrived at the motel about 2:45 *1204 A.M. that morning. He had just moved out of a house due to a disagreement with the person with whom he was living, and was planning to move in with his sister the next day. After stopping at a lounge a short distance away from the motel for about an hour, plaintiff, who has trouble seeing at night, had two men bring him and his truck to the motel.
After plaintiff arrived at the motel, he approached the late-night check-in window to ring for service. While he was walking up to the window, a stranger approached and asked plaintiff if he wanted to join him in his room for a drink. Plaintiff refused the offer, and the man walked away. Plaintiff then rang for a room, and Mrs. Pearl Nixon answered the bell. Mrs. Nixon and her husband George, along with their sons, are the owners and operators of the Admiral. The Nixons' bedroom adjoins the motel office, where they handle late-night check-ins through a small window. The office closes at 10:00 P.M. every night. Mrs. Nixon recognized plaintiff, since he had stayed at the motel a few times before. She knew plaintiff was somewhat paralyzed and filled in his registration form for him.
Because he was suspicious of the man who had approached him to have a drink, plaintiff asked Mrs. Nixon if he could come inside the office to pay for his room. Plaintiff alleges he told Mrs. Nixon about the man's presence and expressed concern about having to take out his money should the man still be in the area. Plaintiff was concerned because he was carrying a large amount of cash and because he had trouble manipulating his fingers in order to handle the money, which he always kept in his front left pocket. Mrs. Nixon refused plaintiff's request to come inside, saying it was against their policy. Plaintiff then paid for his room through the window. He was given the key to Room 1, which he specifically requested because it was adjacent to the office and better lighted than rooms in the rear of the hotel where he was afraid to go.
After plaintiff paid for the room, Mrs. Nixon closed the window. Plaintiff then walked to his truck, which was parked only a few feet away, directly in front of the check-in window. As soon as plaintiff got in his truck, the man who had approached him earlier came up to the side of the truck and demanded all his money. Before plaintiff could answer, the man began to slash plaintiff's arm and chest with a knife. Plaintiff tried to resist, but the man reached directly into plaintiff's front left pocket and took all his money. He had apparently seen plaintiff take out his money to pay Mrs. Nixon. The man, who later was discovered to be another motel guest named Byron Fraser, continued his attack after he had plaintiff's money. He told plaintiff, "I didn't want you to have a drink anyway, all I wanted was your money and now that I've got your money I'm going to kill you." He then cut plaintiff's neck two times, but as Fraser attempted to cut plaintiff's neck a third time, plaintiff was able to grab the blade of the knife and break it off. Fraser then turned and ran. Plaintiff managed to get back to the check-in window, where he again rang for Mrs. Nixon and asked her to call an ambulance. Mrs. Nixon offered him no other assistance and did not come out to help him. Plaintiff sat on the curb bleeding until the ambulance came and took him to Earl K. Long Charity Hospital, where he remained for about three hours while his cuts were sutured and bandaged.
Plaintiff thereafter filed suit against Byron Fraser, Mr. and Mrs. Nixon, d/b/a Admiral Motel, and the Nixons' insurer, St. Paul Fire and Marine Insurance Company, seeking damages for the personal injuries he received in the attack. The suit, insofar as it related to the Nixons and their insurer, was based upon the Nixons' failure to take reasonable precautions for plaintiff's safety. The case was tried on February 18, 1982, after which the matter was taken under advisement. Judgment on the issue of liability was rendered on May 13, 1982, and on the issue of quantum on August 17, 1982. Final judgment was signed on August 31, 1982 in favor of plaintiff and against all defendants in solido in the amount of $25,240.00, plus interest and costs. The Nixons and their insurer have perfected this suspensive appeal, which plaintiff has answered seeking an increase in quantum.
*1205 Appellants have set forth three assignments of error, the first two of which concern the imposition of liability. Appellants' initial contention is that the trial court imposed a more stringent duty of care than the law requires of innkeepers towards their guests. Appellants' second contention is that the trial court erred in finding liability without causation on the part of the Nixons. These two assignments of error will be addressed together.
In Kraaz v. LaQuinta Motor Inns, Inc., 410 So.2d 1048 (La.1982), the Supreme Court set forth the duty of innkeepers to protect their guests against criminal acts as follows:
"An innkeeper does not insure his guests against the risk of injury or property loss resulting from violent crime. LSA-C.C. art. 2970, supra. The innkeeper's position vis-a-vis his guests is similar to that of a common carrier toward its passengers. Wilson v. Iberville Amusement Co., 181 So. 817 (Orl. [La]. App.Ct. 1938). Thus, a guest is entitled to a high degree of care and protection. See Galland v. New Orleans Public Service Inc., 377 So.2d 84 (La. 1979), and Green v. TACA, 304 So.2d 357 (La.1974). The innkeeper has a duty to take reasonable precautions against criminals." 410 So.2d at 1053.
Prior to this decision, the jurisprudence was clear that the duty to protect business patrons does not extend to the unforeseeable or unanticipated criminal acts of an independent third person. Only when the owner or management of a business has knowledge, or can be imputed with knowledge, of a third person's intended criminal conduct which is about to occur, and which is within the power of the owner or management to protect against, does such a duty of care towards a guest arise. See McKinney v. Louisiana Nat. Bank, 416 So.2d 948 (La.App. 1st Cir.1982); Pennington v. Church's Fried Chicken, Inc., 393 So.2d 360 (La.App. 1st Cir.1980); Cooper v. Ruffino, 172 So.2d 717 (La.App. 4th Cir. 1965); Miller v. Derusa, 77 So.2d 748 (La. App. 1st Cir.1955).
Appellants submit the trial court utilized an incorrect interpretation of the Kraaz case in reaching its decision. In the trial court's written reasons for judgment, it is evident the court read the Kraaz case as imposing a new greater standard of care for innkeepers. The Supreme Court seemed to equate the duty of an innkeeper to that required of common carriers to insure the safety of their passengers. The common carrier must prove a lack of negligence anytime a passenger is hurt. See Galland, supra. We think the comparison made in Kraaz between the respective duties of an innkeeper and a common carrier was only to emphasize the guests of both are entitled to a high degree of care. However, we find it unnecessary to decide whether the Kraaz decision was intended to change the substantive law and the burden of proof required in such a case. We conclude the trial court was correct in imposing liability, even under the jurisprudence as it stood before Kraaz was decided.
The record supports the trial court's holding that Mrs. Nixon was negligent in that she did nothing when put on notice concerning an impending criminal incident which was within her power to help prevent. Though appellants contend the attack was not foreseeable since Fraser had been a guest at the hotel for about a week and a half and had caused no trouble, and since there had never been any previous incident at the hotel involving an attack on a guest, the record shows that Mrs. Nixon had been suspicious of Fraser even before plaintiff expressed his concern immediately before the attack. On the morning after the attack when plaintiff was released from the hospital, he and his former sister-in-law, Jeannie McLin, went back to the hotel to pick up the truck. Ms. McLin and plaintiff both testified that when they went into the hotel office to ask if the attacker had been caught, Mrs. Nixon told them Fraser had been arrested. They also testified Mrs. Nixon told them she had been suspicious of Fraser, who often stayed around the pay telephone by the office at night, though she didn't think Fraser was ever making any calls. She also told them Fraser had rung *1206 the bell requesting telephone change shortly before plaintiff checked in. Mrs. Nixon testified Fraser did ask for change, but after plaintiff checked in. The trial court resolved this and other inconsistencies in the testimony in favor of plaintiff, a credibility assessment which we do not question. The preponderance of the evidence is to the effect that the attack occurred almost immediately after plaintiff checked in.
We therefore have a factual situation in which the innkeeper was aware of suspicious activity and was asked for protection against a specific threat. Mrs. Nixon refused to allow plaintiff to come inside the office, despite his plea for assistance. Plaintiff, who Mrs. Nixon knew was disabled and had no reason to fear, was forced to expose a large quantity of money, thus increasing the likelihood of an attack. Even if Mrs. Nixon, an elderly woman, chose to refuse plaintiff's request to come inside, she could have taken other precautions for plaintiff's safety. As soon as Mrs. Nixon took plaintiff's money and gave him the key, she closed the check-in window and went back to bed. She could have made an effort to watch and see if plaintiff reached his room safely, since it was adjacent to the office. If she had, the attack might well have been prevented or at least cut short. The Coke machine in front of the office contained a loud siren which Mrs. Nixon could have activated from the office and thus caused the assailant to desist. A second siren was also available for alarm purposes.
We find, as did the trial court, that
"... the duty of care required of an innkeeper was not met by the defendants. The defendants were aware of criminal activity in the area and consequently did take measures to insure safety from crimebut only for themselves and their property. In fact, the defendants, themselves, inadvertently increased the possibility of attack on their guests. Because of the check-in method they devised for late night arrivers, their patrons were more likely to be the object of attack and therefore the defendants should have taken even greater precautions to safeguard their patrons's safety."
We therefore conclude the trial court correctly imposed liability upon appellants, as the breach of their duty of care to plaintiff was a substantial factor in causing plaintiff's injuries.
Appellant's final assignment of error is that the award was excessive. Plaintiff has answered the appeal arguing the award is too low. Plaintiff suffered multiple lacerations to his chest, to his left hand and wrist, and to his neck. He also injured his left foot and ankle while attempting to repel Fraser. The trial court found as a matter of fact that plaintiff was "seriously and grievously injured." In order to compensate plaintiff for "physical injuries inflicted upon him, and the permanent scarring, limitation of motion, disability, shock, fright, fear and mental anguish and anxiety experienced," the trial court awarded general damages in the sum of $25,000.00.
La.Civ.Code art. 1934(3) grants the trier of fact "much discretion" in assessing general damages. Before an appellate court can disturb an award by a trial court, the record must clearly reveal an abuse of this "much discretion." Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). A trial judge abuses his "much discretion" when he grants an award in excess of or below the amount that reason dictates is necessary to adequately compensate the person for his injury under the facts shown to exist in his case. Reck v. Stevens, 373 So.2d 498 (La.1979); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
From our review of the record, we conclude the award was within the discretion of the trial court. Though plaintiff did not require a long period of hospitalization following his emergency treatment in which his cuts were sutured and bandaged, the areas of plaintiff's injuries were extremely painful for several weeks. And, even though the knife wounds healed in approximately five weeks, they left plaintiff permanently disfigured. Plaintiff was examined by Dr. William E. Smith, a Baton Rouge orthopedist, more than one year after the attack. Dr. Smith's report shows plaintiff had a "long and well healed oblique *1207 scar over the anterior chest region," a "1¼ A inch long transverse laceration" on the dorsal surface of plaintiff's left hand, and a "1 inch long longitudinal laceration over the dorsal thumb web space" on plaintiff's left hand.
Plaintiff has also related numbness and soreness in the use of his left thumb. Although Dr. Smith found no objective evidence of significant sensory loss, he admits the site of the laceration of the dorsal surface of plaintiff's left hand suggests the possibility of injury to certain sensory branches of the radial nerve. Dr. Smith's report also states plaintiff probably sprained his left ankle in the attack, though the ankle has now healed. Dr. Smith also reported a 5 percent disability of the plaintiff's left foot due to a "fracture of the terminal phalanx of the great toe" which has failed to heal and due to soft tissue injuries about the DIP joints of the third and fourth toes of the left foot.
In addition, plaintiff testified he has had reoccurring nightmares of being assaulted with a knife. On numerous occasions he has awakened in the middle of the night, raising up in bed kicking his feet. Without a doubt, plaintiff's psychic injuries are almost as severe as his physical injuries due to the horrible nature of the attack in which plaintiff had to struggle for his life. We thus conclude the award was well justified under the facts of this case.
For the above reasons, the judgment of the trial court is affirmed. Appellants are to pay costs.
AFFIRMED.