451 So.2d 96 (1984)
HARPER OIL FIELD SERVICES, Plaintiff-Appellee,
v.
Lee DUGAS, et al., Defendants-Appellants.
No. 83-573.
Court of Appeal of Louisiana, Third Circuit.
May 16, 1984.
*98 Gibbens & Blackwell, J. Louis Gibbens, New Iberia, for defendants-appellants.
Privat & Regan, Thomas K. Regan, Crowley, for plaintiff-appellee.
Jacques Cousin, Louis C. Guillot, New Iberia, for defendant-appellee.
Before DOMENGEAUX, C.J., and GUIDRY and DOUCET, JJ.
GUIDRY, Judge.
Harper Oil Field Services (hereafter Harper), a partnership composed of Robert Coleman and Hillary Cart, filed this suit for tortious conversion of a mud tank, seeking damages for loss of use, embarrassment, humiliation and attorney's fees. Named as defendants were 4-D Sandblasters, Inc. and its successor corporation, 4-D Corrosive Control Specialists, Inc. (hereafter 4-D); Lee Dugas, the chief executive officer and the principal stockholder of 4-D; Welders Unlimited, Inc. (hereafter Welders); Richard Dautreuil, the chief executive officer and principal shareholder of Welders; and Dresser Industries, Inc., d/b/a Magcobar (hereafter Magcobar).
Dugas and 4-D filed a reconventional demand against Harper for tortious interference with a contract of sale, seeking damages and attorney's fees. Dugas and 4-D also filed third party demands against Dautreuil and Welders for amounts due on open account.
Magcobar was dismissed from the suit on a motion for summary judgment. That judgment was not appealed and is now final.
After trial on the merits, the trial judge rendered judgment in favor of Harper and against 4-D ordering a return of the mud tank and for damages for loss of use in the principal amount of $1,200.00. Plaintiff's demands against Lee Dugas and Richard Dautreuil, individually, were dismissed with prejudice. Further, judgment was rendered granting 4-D's reconventional demand against Welders in the principal amount of $7,533.95. All other demands were ordered dismissed with prejudice. 4-D appeals only the judgment on the main demand. Harper has answered the appeal seeking only an increase in damages.

*99 FACTS
In September of 1980, Robert Coleman and Hillary Cart formed Harper, a partnership, for the purpose of leasing out oil field equipment. Mr. Coleman was employed as a mud engineer in the oil business and learned that Welders had four 1000 gallon capacity pneumatic mud tanks for sale. The four tanks had been specially ordered by a company which subsequently went out of business and was unable to complete the sale. On September 23, 1980, Mr. Coleman, on behalf of Harper, concluded negotiations for the purchase of one of these tanks from Welders and issued a check in the amount of $7,200.00 to Welders. Mr. Coleman was given a dated invoice, marked paid, describing the tank as "one cylindrical 1000 sack capacity mud tank serial # WU-1000-1." It was understood that the tank required sandblasting and repainting. The invoice recited "terms C.O.D. upon completion F.O.B.", but it was also agreed that Mr. Coleman could delay picking up the tank indefinitely.
The other three tanks, which were part of the special order, were sold by Welders to a Mr. Ortego of Houma, Louisiana. Welders had contracted with 4-D to sandblast and paint the four cylindrical tanks upon completion of fabrication. The four tanks were delivered to 4-D by Welders in the latter part of September or in October of 1980. At this point we disgress to note that throughout the trial of this matter, 4-D maintained that upon delivery of the tanks to it for sandblasting and painting, Welders failed to indicate that the four tanks had been sold. Subsequent to the delivery of the tanks, 4-D was contacted by Mr. Ortego and three of the tanks were painted green and white to his specifications. Sometime after November 10, 1980, Mr. Ortego picked up the three tanks which were painted green and white. The remaining tank had been previously blasted but was reblasted and repainted solid white.
On December 31, 1980, 4-D's lease of its business premises terminated. 4-D then moved its facilities and the great majority of its equipment from its former location on Daspit Road to the Port of Iberia. The solid white tank remained at the Daspit Road location until January 26, 1981, at which time it was trucked to 4-D's facilities at the Port of Iberia. Sometime after the first of the year, Mr. Ortego received a call from Lee Dugas inquiring as to whether the remaining tank was his. Mr. Ortego informed Mr. Dugas that the remaining tank was not his. Mr. Dugas also inquired as to the value of the tank, expressing an interest in selling the tank to satisfy a debt owed by Welders. On January 30, 1981, Richard Dautreuil met with Lee Dugas to settle a problem that 4-D had with Welders' accounts receivable. Dugas contends that at this meeting, Dautreuil agreed, on behalf of Welders, to transfer ownership of the mud tank in question and four large offshore baskets to 4-D in satisfaction of an outstanding debt of $7,533.95 due by Welders to 4-D.
Subsequently, 4-D began negotiations with Magcobar for the sale of the mud tank. During the negotiations, Mr. Dugas of 4-D informed a Mr. Ray of Magcobar that the tank belonged to Richard Dautreuil of Welders and that 4-D was selling the equipment with the consent of Dautreuil to satisfy a debt. The parties agreed on a price and that the tank would be repainted orange and white, the Magcobar flag colors. A check was issued for the stipulated amount through Magcobar's Houston office and Magcobar took possession of the tank on or about March 14, 1981.
Just prior to that date, Harper had begun negotiations with Frances Drilling Fluids for the lease of the mud tank. The deal was to be consummated upon visual inspection of the tank. Thereafter, on or about March 15, 1981, Mr. Coleman went to 4-D in search of the tank. Upon learning that the tank had been repainted the Magcobar flag colors and was no longer in 4-D's possession, Mr. Coleman and Mr. Cart went to Magcobar in search of the tank. Upon discovering the tank at Magcobar, Mr. Cart advised Mr. Ray that he *100 believed the tank belonged to Harper. Mr. Ray testified that he was also contacted by Richard Dautreuil who advised him that he had sold that particular tank to Harper. Magcobar thereafter, with 4-D's consent, returned the tank to 4-D and stopped payment on their check. Mr. Dugas, after regaining possession of the tank, refused to deliver same to Harper. Harper was therefore unable to consummate the rental agreement with Frances Drilling Fluids or to acquire possession of the tank and this suit followed.
In written reasons for judgment, the trial judge made the following findings pertinent to this appeal:
1. The tank in question was the tank purchased by Harper from Welders;
2. 4-D never acquired ownership of the tank; and
3. Plaintiff failed to prove its claims for conversion, inconvenience, distress and attorney's fees.
Based upon the aforestated findings, the trial court concluded that substantial justice would be effected between the parties by ordering a return of the tank by 4-D to Harper with an allowance of damages to Harper for the loss of use of the tank at the rate of $10.00 per day for a period of 120 days.

LIABILITY OF 4-D
On appeal, 4-D makes the following assignments of error:
1. The trial judge erred in finding that the tank possessed by 4-D was the tank which Harper purchased from Welders.
2. The trial judge erred in failing to find that 4-D acquired ownership of the tank in question.
3. The trial judge erred in awarding loss of use damages to Harper.
After carefully reviewing the record, we concur with the finding of the trial judge that a preponderance of the evidence supports the conclusion that the tank in the possession of 4-D is the same tank which Harper purchased from Welders. On this issue, 4-D relies on the absence of a serial number on the tank in its possession because the invoice given to Harper in receipt for payment, identified the tank purchased by serial number. For the following reasons, we do not find the absence of a serial number to be dispositive of the issue of identification. The record establishes that four tanks were built by Welders to specifications, sufficiently uncharacteristic in the industry to allow for identification. All four tanks were fabricated pursuant to certain schematic drawings which were provided to Harper by Welders in conjunction with the sale. These drawings are made a part of the record. All four tanks were delivered by Welders to 4-D. These four tanks were the only mud tanks which 4-D was doing work on at the time. Three of the tanks were subsequently picked up by Mr. Ortego. These three tanks bear consecutive serial numbers 0002, 0003 and 0004. Harper's tank is identified on the invoice by serial number 0001. The record indicates that the tank sold to Harper was the first tank on which fabrication was completed and the only tank which required sandblasting and repainting. The most likely explanation is that the serial number was either never put on the tank or else subsequently removed in the sandblasting process.
We further find no clear error in the trial court's finding that 4-D failed to show that it ever acquired ownership of the tank in question. In written reasons for judgment, the trial judge stated as follows:
"The only evidence of the claimed transfer of title to the tank to Dugas/4-D comes from Dugas himself. This is refuted by the statement made by Dautreuil himself to Ernest Ray of Magcobar."
Richard Dautreuil was apparently unavailable to testify at trial. Therefore, the only evidence introduced at trial of the alleged transfer of ownership of the tank to 4-D is found in the self-serving testimony of Lee Dugas. Because of the trial judge's ability to see and hear the witnesses, great weight is accorded his evaluation of credibility. We are unable to say that *101 the trial judge's evaluation of the evidence was clearly wrong. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
In addition, we observe that 4-D's contention that Magcobar was a good faith transferee for fair value is not material to this case. The purported transfer of the tank by 4-D to Magcobar was rescinded by consent of the two parties and Magcobar's possession or ownership is not at issue.[1]
4-D's third assignment of error presents multiple questions. Although the trial judge stated in written reasons for judgment that plaintiff failed to prove its claim for conversion, he nonetheless awarded damages to plaintiff for loss of use. The trial court's written reasons are silent as to the basis for this award. On appeal, 4-D contends that an award of damages was improper where defendants acted reasonably, prudently, and in good faith. 4-D's additional contention that the evidence supporting an award for loss of use is at best equivocal, will be considered later in connection with Harper's request for an increase in damages.
There was no contractual or deposit relationship between Harper and 4-D. As owner, Harper is entitled only to judgment recognizing his ownership and ordering delivery of the tank to him (LSA-C.C. Art. 526), unless he can show some other basis for 4-D's liability for damages.
For the reasons which follow, we conclude that 4-D is liable in damages to plaintiff for tortious conversion of the tank in question and the trial court erred in finding otherwise.
The common law tort of conversion has long been recognized in Louisiana as actionable under LSA-C.C. Art. 2315. Central Fidelity Bank v. Gray, 422 So.2d 670 (La.App. 3rd Cir.1982). Conversion has been defined as "a distinct act of dominion wrongfully exerted over another's property in denial of or inconsistent with the owner's rights therein." Lincecum v. Smith, 287 So.2d 625 (La.App.3rd Cir.1973), writ refused, 290 So.2d 904 (La.1974) and authorities cited therein. 4-D's attempted sale to Magcobar and subsequent refusal to accede to plaintiff's demand that the mud tank be returned were wrongful acts of dominion inconsistent with Harper's rights therein.
There is no requirement in our jurisprudence, as the trial judge seems to conclude, that the act of dominion to constitute a tortious conversion be that of a depositary.
4-D's contention that it acted prudently and in good faith is of no avail. In Lincecum v. Smith, supra, at 628, we cited with approval on this point Prosser's Handbook of the Law of Torts 83-4 (3rd Ed. 1964):
"The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights... Persons ... exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts."
4-D's final contention in brief that its continued possession (if not the attempted sale) of the mud tank was not wrongful or inconsistent with Harper's rights therein, but was rather a legal detention pursuant to LSA-C.C. Arts. 527, 528 and 529,[2] or *102 pursuant to LSA-R.S. 9:4501 or 9:4502[3] is also without merit.
We first note that the aforestated justifications for retention are apparently afterthoughts as 4-D has always opposed Harper's ownership by asserting its own ownership of the tank in question. Additionally, the record does not factually support any rights in 4-D under LSA-C.C. Arts. 527, 528 and 529. There is no indication that either necessary or useful expenses were incurred by 4-D or that any demand was ever made for same. The record also reflects that 4-D was paid $3,816.59 by Welders for the work done on the four tanks. The testimony of Lee Dugas that approximately $156.00 was due for touch-up blasting and coating on the tank in question was objected to as enlarging the pleadings and we think properly sustained. In any event, we do not consider that LSA-R.S. 9:4501 or 9:4502 gives the repairman the right to reclaim or retain possession by self help. His proper remedy is to assert his privilege through legal machinery during the statutory period. See Martinez v. Therma-King Sales and Service Division of Transport Refrigeration of La., Inc., 346 So.2d 798 (La.App. 1st Cir.1977); Miller v. Harvey, 408 So.2d 946 (La.App.2nd Cir.1981).

DAMAGES
Harper has answered the appeal asking for damages for additional loss of use and for mental anguish and humiliation.
The function of an appellate court in reviewing a damage award is not to decide what it considers an appropriate award on the basis of the evidence, but rather only to review the exercise of the trier of fact's discretion. Kalmn, Inc. v. Empiragas Corp., 406 So.2d 276 (La.App. 3rd Cir.1981), LSA-C.C. Art. 1934(3). Thus this review of the trial court's award of $1,200.00 for the loss of use of the mud tank is limited to a determination of whether or not the trial court abused its much discretion.
Though trial judges are granted great discretion in determining damage awards, the awards made must be in accordance with law. Cenac v. Duplantis Moving & Storage Company, Inc., 407 So.2d 424 (La.App. 1st Cir.1981). In Louisiana, the primary objective for awarding damages is to place the injured party in as near a fashion as possible to the state in existence at the time immediately preceding the injury. Roshong v. Travelers Insurance Company, 281 So.2d 785 (La.App. 3rd Cir.1973).
The trial judge based his award of loss of use damages on the testimony of Mr. Ray of Magcobar. In so doing, he stated that the court placed great credence in Mr. Ray's testimony as that of an unbiased and truthful third party.
The testimony of Mr. Ray relied on by the trial judge is as follows:
"Q. If you had a tank like this one that you have already described to us today that is in dispute, what would you earn for that tank today on a daily basis if you had work for it?
A. Well, we don't rent these tanks. They're put on a location free of charge so that the material we sell can be stored in them. I'm not familiar with any rent on these tanks. We were offered tanks a good while back for $10.00 a day each, there were three on the job, and they didn't do it because they had to get a dragline out for something else and they got our tank out from in back of the rig before the rig was moved to go to another location."
In contrast, plaintiff presented the testimony of Mr. Jim Walker, a representative of Frances Drilling. The uncontroverted testimony of Mr. Walker indicates that Harper had secured an arrangement with *103 Frances for the rental of the mud tank and that the arrangement fell through only because of 4-D's continued possession of the tank. Mr. Walker testified that he had entered into an agreement with Mr. Coleman concerning the tank in question at the rate of $50.00 per day or $2,000.00 per month and that said rental would have been for three months until such time as Frances Drilling could obtain its own tank or arrange for a sale from Harper. Mr. Walker testified that at the time these tanks were in great demand and there was a three month backlog in order to obtain such a tank. Mr. Walker went on to testify that his company would have paid in excess of $9,000.00 for such a tank if one could have been obtained and was willing to pay the sum of $50.00 per day or $2,000.00 per month if the aforementioned deal could have been consummated.
4-D's contention that this testimony is equivocal because the deal was, in fact, never consummated is without merit. The uncontroverted testimony of Mr. Walker is that the only reason that the lease was not consummated was that Harper was unable to obtain possession of the tank.
We conclude that the trial court abused its discretion in basing its calculations on the testimony of Mr. Ernest Ray. Despite the judge's reliance on Mr. Ray's credibility, the clear import of Mr. Ray's testimony is that he was unfamiliar with the rental of such tanks. His one experience is in no way related to the fair market value of rentals at the time in question. The actual loss to plaintiff was the $50.00 per day rate which Frances Drilling was ready, willing and able to pay. We therefore consider that an award of $50.00 a day for a period of 120 days will adequately compensate plaintiff.
The trial judge denied damages for mental anguish and humiliation finding no evidence to support plaintiff's claims for conversion or mental anguish. In Lincecum v. Smith, supra, at 629, we stated:
"... we agree that when it is found that a taking is `wrongful and without the consent of the plaintiff, some humiliation, embarrassment and inconvenience follows.' Steadman v. Action Finance Corp., 197 So.2d 424 (La.App.2nd Cir. 1967)."
In the present case, after having agreed to lease the mud tank to Frances Drilling, Harper was unable to deliver the tank due to 4-D's wrongful possession. Harper was a new company which was unable to get its business established once it was deprived of its only source of income. "Under our jurisprudence a party aggrieved by a wrongful seizure is entitled to recover not only the special damages caused him, but also general damages for mortification, humiliation and mental worry caused by the intentional violation of his property rights." Mid-State Homes, Inc. v. Lartigue, 383 So.2d 99 (La.App. 3rd Cir. 1980).
Our examination of the circumstances surrounding this conversion indicates that an award of $500.00 for mental anguish and humiliation would be adequate and proper.
The trial court assessed costs equally against both parties. Costs are to be assessed in accord with equity. LSA-C. C.P. Arts. 1920 and 2164. The trial court rejected every element of defendants' reconventional demand and on appeal, we reverse the judgment of the trial court to find defendants liable for tortious conversion. For these reasons, we find that defendants should bear all costs in both the trial and appellate courts.
For the above and foregoing reasons, the fourth paragraph of the judgment of the trial court is amended to read as follows:
"It is ordered, adjudged and decreed that there be judgment herein in favor of Harper Oil Field Services and against 4-D Sandblasting, Inc. and 4-D Corrosion Control Specialist, Inc. in the amount of $6,500.00, together with legal interest thereon from date of judicial demand until paid."
The seventh paragraph of the judgment of the trial court is amended to read as follows:

*104 "... ordered, adjudged and decreed that all costs shall be paid by 4-D Sandblasting, Inc. and 4-D Corrosion Control Specialist, Inc."
In all other respects the judgment of the trial court is affirmed. Defendants, 4-D Sandblasting, Inc. and 4-D Corrosion Control Specialist, Inc. are cast for all costs of this appeal.
AFFIRMED AS AMENDED.
NOTES
[1] In so noting, we do not consider whether LSA-C.C. Art. 520, 1979 La.Acts, No. 180 § 1 (effective January 1, 1980), suspended in 1980, La.S.Con.Res. No. 172, 6th Reg.Sess. (1980); repealed by 1981 La.Acts No. 125 § 1, was in effect at the time of the purported transfer.
[2] Art. 527. Necessary expenses. The evicted possessor, whether in good or in bad faith, is entitled to recover from the owner compensation for necessary expenses incurred for the preservation of the thing and for the discharge of private or public burdens. He is not entitled to recover expenses for ordinary maintenance or repairs.

Art. 528. Useful expenses. An evicted possessor in good faith is entitled to recover from the owner his useful expenses to the extent that they have enhanced the value of the thing.
Art. 529. Right of retention. The possessor, whether in good or in bad faith, may retain possession of the thing until he is reimbursed for expenses and improvements which he is entitled to claim.
[3] LSA-R.S. 9:4501 and 9:4502, both subsequently amended by Acts 1983, No. 359, § 1, provide privileges on machinery in favor of those fabricating or repairing such machinery for labor and parts.