529 So.2d 417 (1988)
Wayne LANDRY, et al.
v.
STATE FARM INSURANCE COMPANY, et al.
No. CA 870666.
Court of Appeal of Louisiana, First Circuit.
June 21, 1988.
*419 William E. LeBlanc, Donaldsonville, for Wayne Landry, et al. Thomas A. Lane, Baton Rouge, for State Farm Ins. Co.
Ben Lightfoot, Baton Rouge, for Ins. Guar. Ass'n.
Before WATKINS, CARTER and FOIL, JJ.
CARTER, Judge:
This is a suit for damages arising out of an automobile accident at the intersection of La. Highway 70 and La. Highway 1 in Assumption Parish. At this intersection, La. Highway 1 is the favored highway, and stop signs control the traffic on La. Highway 70.

FACTS
On December 11, 1982, at approximately 2:40 p.m., Wayne Landry, accompanied by his minor son Kip, was proceeding west on La. Highway 70 toward the intersection with La. Highway 1 in a 1977 pickup truck. At the same time, Jacqueline Hughes was proceeding north on La. Highway 1 toward the intersection with La. Highway 70 in a 1969 Pontiac automobile owned by Gwendolyn Hughes.
Shortly before the accident, the Louisiana State Police had been summoned to investigate another accident at the intersection. Deputy Donald Blanchard, Jr. of the Assumption Parish Sheriff's office directed traffic around the accident site. As both the Landry and Hughes vehicles approached the accident site, Deputy Blanchard signaled Ms. Hughes to stop and then signaled Mr. Landry to proceed through the intersection. At the deputy's instruction, Mr. Landry slowly and cautiously proceeded into the intersection. As this occurred, Deputy Blanchard noticed that Ms. Hughes had failed to obey his signal and was also proceeding into the intersection. As a result, the Hughes vehicle collided with the Landry vehicle, resulting in property damage and personal injuries.
On December 12, 1983, Wayne Landry, individually and as administrator of the estate of his minor son Kip, filed suit for damages for personal injuries and property damage.[1] Named as defendants were State Farm Insurance Company, Landry's uninsured/underinsured motorist insurer; Gwendolyn Hughes; and American Druggist's Insurance Company, liability insurer of the Assumption Parish Sheriff's office.[2] *420 After trial, the trial judge rendered judgment in favor of plaintiff and against State Farm and Insurance Guaranty, finding Ms. Hughes 60% at fault and Deputy Blanchard 40% at fault in causing the accident. The trial judge awarded damages, plus costs, as follows:

1) Property damage $ 2,080.00
2) Medical Bills $ 1,075.00
3) Loss of Earning Capacity $65,000.00
4) General damages $25,000.00
5) Penalties $ 3,000.00
6) Attorney's fees $ 8,333.33

From this judgment, State Farm appeals, assigning the following errors:
I.
The trial court erred in finding the uninsured motorist, Jacqueline Hughes, 60% at fault and Deputy Blanchard and his employer 40% at fault.
II.
The trial court erred in awarding $25,000.00 as general damages to a 17-year-old male for a knee injury that did not require reconstructive surgery, but required only minimal treatment and moderate activity restrictions.
III.
The trial court erred in awarding $65,000.00 for lost earning capacity to a 17-year-old male with no work history and no permanent employment because he had not yet finished his education.
IV.
The trial court erred in awarding penalties and attorney's fees in favor of plaintiff and against State Farm Mutual Automobile Insurance Company; $3,000.00 in penalties and $8,333.33 in attorney's fees for failure to tender any amount under UM coverages.
Insurance Guaranty also appealed, assigning the following errors:
I.
The trial court erred in determining that Deputy Blanchard was guilty of negligence which was a proximate cause of the accident sued upon and liable for the injuries sustained therein.
II.
In the alternative, the court erred in the amount of the award it made to plaintiff.
Plaintiff also appealed, raising the following specifications of error:
I.
The trial court erred in awarding only $25,000.00 as general damages to a 17-year-old male for a knee injury which occasioned a permanent twenty-five (25%) percent loss of physical function and physical impairment to the right lower extremity.
II.
The trial court erred in awarding only $65,000.00 for loss of earning capacity to a 17-year-old male when the uncontradicted testimony of all experts stated the loss of earning capacity was $384,514.00.

LIABILITY
Under a duty-risk analysis, the pertinent inquiries into a defendant's liability are:
I. Whether the conduct of which plaintiff complains was a cause in fact of the harm;
II. Whether there was a duty on the part of the defendant which was imposed to protect against the risk involved;
III. Whether there was a breach of that duty; and
IV. Damages.
Vicknair v. Hibernia Building Corp., 479 So.2d 904 (La.1985); Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La. 1984); Eldridge v. Downtowner Hotel, 492 So.2d 64 (La.App. 4th Cir.1986).
A defendant's conduct is actionable under the duty-risk analysis where it is both a cause in fact of the injury and a legal cause of the harm incurred. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Fowler v. State Farm Fire & Casualty *421 Insurance Co., 485 So.2d 168 (La.App. 2nd Cir.1986), writ denied, 487 So.2d 441 (La. 1986). See South Central Bell Telephone Company v. Hartford Accident & Indemnity Company, 385 So.2d 830 (La.App. 1st Cir.1980), writ denied, 386 So.2d 356 (La. 1980). The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere v. Lavergne, supra; Fowler v. State Farm Fire & Casualty Insurance Co., supra. Further, there can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm which occurs and it is substantial in nature. Nix v. Brasly, 489 So.2d 1038 (La.App. 1st Cir.1986); Bodoin v. Daigle, 452 So.2d 828 (La.App. 3rd Cir. 1984), writ denied, 458 So.2d 485 (La.1984).
In the instant case, the trial judge determined that Ms. Hughes and Deputy Blanchard were guilty of negligence proximately causing plaintiff's damages. The trial judge found that Ms. Hughes' fault caused the accident in that she failed to respond to a stop signal given by Deputy Blanchard. The trial judge found that Deputy Blanchard was negligent for signaling the Landry vehicle into the intersection without assuring that the Hughes vehicle had stopped or was stopping and for parking his own vehicle in such a way as to impair each driver's view of the other.
A. Liability of Ms. Hughes
Under LSA-R.S. 32:231(A):
The driver of any vehicle shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with the provisions of this Chapter, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this Chapter.
LSA-R.S. 32:56(A) provides:
No person shall fail or refuse to comply with any lawful order or direction of any police officer or weights and standards police officer invested by law with authority to direct, control, or regulate traffic.
These statutes impose a duty upon the operator of a motor vehicle to comply with any lawful order or directive of any police officer invested by law with the authority to direct, control, or regulate traffic, irrespective of the instructions or signals of a traffic control device. Goff v. Sarradet, 394 So.2d 655 (La.App. 1st Cir. 1980), writ denied, 399 So.2d 600 (La.1981).
In the instant case, Ms. Hughes was proceeding north on La. Highway 1 toward the intersection with La. Highway 70 on a rainy afternoon. As she neared the intersection, she was confronted with two wrecked cars and two police cars with flashing lights. Although she was traveling on the favored street, Deputy Blanchard signaled her to stop, which she failed to do. No direct testimony contradicted the deputy's testimony.
After reviewing the entire record, we find that the record reflects that Ms. Hughes was at fault in causing the accident. Despite the poor weather conditions and the prior accident at the intersection, Ms. Hughes did not exercise reasonable caution in attempting to travel through the intersection. After being given instructions by the deputy directing traffic, Ms. Hughes either failed to see or disregarded the officer's hand signal directing her to stop. Her failure to obey the hand signal and thereafter to proceed cautiously given the circumstances was a substantial cause of the accident. Accordingly, the trial judge correctly determined that Ms. Hughes was at fault in causing the accident.
B. Liability of Deputy Blanchard
In Prattini v. Whorton, 326 So.2d 576 (La.App. 4th Cir.1976), the court found that plaintiff's damage was caused by a combination of Whorton's unreasonable conduct in the operation of the bus and the police officer's repeated, emphatic directions while exercising authority over motorists on city streets. Therefore, the police officer's *422 conduct was a cause in fact of the accident. The court in Prattini v. Whorton, supra, stated:
As to duty-risk, the policeman occupied an official position and was under a responsibility to direct traffic. This duty required him to maintain due regard for the safety of all who would be affected by the discharge of such responsibility. An obvious risk created by a breach of this latter duty would be that damage might be caused to motorists if his directions were improperly or imprudently given. Thus, our policeman's breach of a duty created the very risk that the duty was designed to prevent, namely, injury to innocent motorists because of improper or imprudent behavior in directing traffic.
As to negligence, the policeman unreasonably exercised his authority and failed to see and consider the position of plaintiffs' automobile before he demanded that Whorton proceed in the bus. A reasonably prudent person would not have acted this way under the circumstances. [326 So.2d at 579]
In the instant case, the trial judge found that Deputy Blanchard breached his duty to maintain due regard for the safety of all motorists affected by the discharge of his duty to direct traffic in two ways:
1) He signaled the Landry vehicle into the intersection without assuring that the oncoming Hughes vehicle had stopped or was stopping; and
2) His own vehicle was parked in such a way as to be one of three vehicles obscuring Mr. Landry's view.
While the actions of Deputy Blanchard were not as flagrantly unreasonable as that of the police officer in Prattini v. Whorton, supra, we find that the record amply supports the trial judge's finding that Deputy Blanchard was at fault in causing the accident. Absent direction from Deputy Blanchard, the Hughes vehicle was on the favored highway and had the right of way, and the Landry vehicle was under a duty to stop and yield to the Hughes vehicle. By intervening, pursuant to his authority, Deputy Blanchard assumed the duty for the safe flow of traffic through the intersection. When Deputy Blanchard signaled the Landry vehicle to proceed through the intersection without ascertaining that the Hughes vehicle was not proceeding into the same intersection, he breached his duty and was negligent.

APPORTIONMENT OF FAULT
Having found both defendants negligent, we turn to the matter of apportionment of fault. In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the court looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979) for guidelines in apportioning comparative fault. As set forth by the court, section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. [469 So.2d at 974]
See Mart v. Hill, 505 So.2d 1120 (La.1987). The court also noted in Watson that a variety of other facts may influence the respective degrees of fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. [469 So.2d at 974]
In Turner v. New Orleans Public Service, Inc., 476 So.2d 800 (La.1985), (Justice Lemmon, concurring), Justice Lemmon noted that proportionate percentages of fault should be based on considerations of the *423 parties' respective degrees of duty and causation.
Our analysis of the foregoing factors indicates that the conduct of both Deputy Blanchard and Ms. Hughes were near equally egregious. Deputy Blanchard directed Mr. Landry to proceed through the intersection without first ascertaining that it was safe to do so. Although he had directed the Hughes vehicle to stop and yield the right of way to the Landry vehicle, Deputy Blanchard did not observe Ms. Hughes slow her vehicle or stop before directing the Landry vehicle into the path of the Hughes vehicle. Ms. Hughes, on the other hand, approached an accident site, observed the officer standing in the middle of the intersection, and observed numerous emergency vehicles in the vicinity. Despite this knowledge, she proceeded without extra care or caution.
The weighing of risks in this case dictates that both parties are nearly equally at fault in causing the accident. In allocating fault, the trial judge found Deputy Blanchard 40% at fault and Ms. Hughes 60% at fault. We cannot say that the percentage allocation of fault in this case is clearly wrong.

QUANTUM
On appeal, all parties contend that the trial judge erred in awarding damages. Specifically, the parties question the trial judge's $25,000.00 general damage award and his $65,000.00 award for loss of earning capacity.
A. General damage award
LSA-C.C. art. 1999 grants the trier of fact "much discretion" in assessing general damages. Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Davenport v. Nixon, 434 So.2d 1203 (La.App. 1st Cir.1983). This is particularly true where the facts of the case preclude a precise computation of damages. See Emerson v. Empire Fire & Marine Insurance Company, 393 So.2d 691 (La.1981); Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978); Hymel v. Tom Alexander Brokerage Company, 348 So.2d 104 (La.App. 4th Cir.1977), writ denied, 350 So.2d 894 (La.1977). No mechanical rule for determining damages is to be applied; the quantum in each case must be determined considering the facts and circumstances of that case. Coleman v. Victor, 326 So.2d 344 (La.1976); Kalmn, Inc. v. Empiregas Corporation, 406 So.2d 276 (La.App. 3rd Cir.1981). Although trial judges are granted great discretion in determining damage awards, these awards must be made in accordance with law. Cenac v. Duplantis Moving & Storage Company, Inc., 407 So.2d 424 (La.App. 1st Cir. 1981). The proper goal of a damage award is to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred. Coleman v. Victor, supra; Kalmn, Inc. v. Empiregas Corporation, supra; Williams v. Louisiana Machinery Company, Inc., 387 So.2d 8 (La.App. 3rd Cir.1980).
The function of an appellate court in reviewing a damage award is not to decide what it considers an appropriate award on the basis of the evidence, but rather only to review the exercise of the trier of fact's discretion. Harper Oil Field Services v. Dugas, 451 So.2d 96 (La.App. 3rd Cir.1984). Before an appellate court can disturb an award by a trial court, the record must clearly reveal an abuse of its "much discretion." Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). A trial judge abuses his "much discretion" when he grants an award in excess of or below the amount that reason dictates is necessary to adequately compensate the person for his injury under the facts shown to exist in his case. See Reck v. Stevens, 373 So.2d 498 (La.1979); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
In the instant case, the record reflects that Kip Landry, a guest passenger in his father's vehicle, injured his knee and head in the collision on December 11, 1982. Although he did not receive medical treatment immediately, Kip was examined by his family physician, Dr. Robert Daigle, two days after the accident. Dr. Daigle x-rayed Kip's knee and diagnosed a deep bruise. Dr. Daigle continued to treat Kip *424 for several months, but later referred Kip to Dr. Herbert K. Plauche, an orthopedic surgeon.
On September 8, 1983, Kip was examined by Dr. John Thomas, an associate of Dr. Plauche, for knee problems. Dr. Thomas opined that Kip suffered from traumatic chondromalacia of both the patellas (kneecaps). Dr. Plauche examined Kip on January 26, 1984. At that time Kip complained of pain and swelling in the right knee accompanied by a grating sensation in the right kneecap and an inability to engage in strenuous activity without pain. Dr. Plauche diagnosed chondromalacia of the right patella (softening of the cartilage on the right kneecap).
On October 18, 1984, Dr. Plauche performed arthroscopic surgery, which revealed an old tear of the posterior cruciate ligament and infusible changes and atrophy of the femoral attachment of the ligament. Although Dr. Plauche did not recommend any specific treatment for this condition, he recommended physical therapy. Dr. Plauche discharged Kip on December 27, 1984, but permanently restricted Kip's activities to noncontact sports. Dr. Plauche opined that as a result of the injuries he received in the accident, Kip sustained a 25% loss of physical function of the right lower extremity.
For this injury, the trial judge awarded Kip general damages of $25,000.00. After thoroughly reviewing the record, we cannot say that the trial judge abused his much discretion in awarding damages. See Brown v. Winn-Dixie Louisiana, Inc., 460 So.2d 6 (La.App. 1st Cir.1984), writ granted in part, 462 So.2d 1244 (La.1985).
B. Award for loss of earning capacity
In Smith v. Porche Brothers Lumber and Supply, Inc., 491 So.2d 412 (La.App. 1st Cir.1986), this court correctly and succinctly set forth the law as follows:
Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the court must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which do not work an injustice on either party. Robinson v. Graves, 343 So.2d 147 (La.1977); Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2nd Cir.1984). A loss of future income award is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury. Such an award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of future income awards thus encompass the loss of a plaintiff's earning potentialthe loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience and for which he may receive recompense. Coco v. Winston Industries Inc., supra; Naylor v. La. Dept. of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writs denied, 427 So.2d 439, 429 So.2d 127, 134 (La.1983).
In determining an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity. Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064 (La.App. 1st Cir.1983), writs denied, 433 So.2d 1056, 1057 (La. 1983). Other facts which may be considered in fixing awards of impairment of earning capacity are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and the inflation factor. Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1st Cir.1982). However, before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made by the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a *425 different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., supra; Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir. 1982), writ denied, 414 So.2d 1253 (La. 1982). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra. [491 So.2d at 415-416]
In the instant case, the record reflects that at the time of the accident Kip Landry was a sixteen-year-old high school student. Kip maintained a "B" average. He had not yet engaged in full-time employment, but had engaged in summer employment remodeling a TG & Y. His duties during this time included moving shelves, cases, and boxes of merchandise. This activity was painful and caused Kip's knee to swell. He continues to experience pain and swelling when standing for long periods of time.
Jennifer Palmer, a rehabilitation and vocational counselor, testified by deposition. Ms. Palmer evaluated Kip on February 28, 1986, noting that Dr. Plauche had assigned a 25% impairment rating and that Kip was following a college preparatory program in college. Kip scored above average in intelligence on achievement tests administered by Mrs. Palmer. The interest tests revealed a primary interest in an occupation as a chef, and Kip expressed an interest in the restaurant business. Kip also had a secondary interest in science, which would include occupations as a geologist, biologist, chemist, etc. Ms. Palmer testified that geologists earned an annual salary of approximately $42,000.00, while chemical engineers earned $27,420.00 annually. Ms. Palmer used the medical impairment figure to eliminate certain occupations for which Kip would not be qualified because of possible stress to his knee. In terms of summer employment, Ms. Palmer opined that Kip was not physically qualified to perform construction or offshore work which paid between $7.00 and $8.00 an hour, but recommended that he could perform clerical or cashier duties which paid between $3.35 and $5.00 an hour.
Dr. Melville Wolfson, economist, testified by deposition as to loss of earning capacity. Assuming that a sixteen-year-old could not physically perform the duties of a geologist paying $42,000.00 and that the highest paying job he could perform was that of a chemical engineer paying $27,420.00, Dr. Wolfson opined that lost wages would total some $378,394.00. This figure was based on an earning differential of $14,580.00 from age 22 to age 61.5 taking into account a 6% growth rate and a 7.5% discount rate. Dr. Wolfson assessed a present value of $25,953.60 for each $1,000.00 of annual loss of earning capacity. He testified that loss of earning capacity for summer employment totalled $6,120.00. Wolfson based this figure on the earning differential of employment at $4.17 an hour as opposed to an hourly wage of $7.50.
After considering all of the evidence, the trial judge determined that during his lifetime, Kip would sustain a loss of earning capacity of approximately $65,000.00. After thoroughly reviewing the record, we find that the trial judge's award is reasonably supported by the record.

PENALTIES AND ATTORNEY'S FEES
LSA-R.S. 22:658 provides, in pertinent part, as follows:
A. All insurers issuing any type of contract, other than those specified in R.S. 22:656 and R.S. 22:657, shall pay the amount of any claim due any insured, including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950, within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest.
B. (1) Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition *426 to the amount of the loss, of ten percent damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.
In Hart v. Allstate Insurance Company, 437 So.2d 823 (La.1983), the Louisiana Supreme Court held that LSA-R.S. 22:658 applied to uninsured or underinsured motorist's claims. Burton v. Foret, 484 So.2d 753 (La.App. 1st Cir.1986). A claimant for penalties and attorney's fees under the statute has the burden of proving that the insurer failed to pay the claim within 60 days after receiving "satisfactory proof of loss" of the claim and that the insurer was arbitrary or capricious in failing to pay. A "satisfactory proof of loss" within the meaning of LSA-R.S. 22:658 is that which is sufficient to fully apprise the insurer of the insured's claims. McDill v. Utica Mutual Insurance Company, 475 So.2d 1085 (La.1985); Hart v. Allstate Insurance Company, supra; Burton v. Foret, supra. To establish a "satisfactory proof of loss" of an uninsured/underinsured motorist's claim, the insured must establish that the insurer received sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or underinsured; (2) that he was at fault; (3) that such fault gave rise to damages; and (4) establish the extent of those damages. McDill v. Utica Mutual Insurance Company, supra; Burton v. Foret, supra.
When there is a dispute as to the nature of the loss, the insurer's refusal to pay the claim is not arbitrary or capricious. Burton v. Foret, supra; Reed v. United States Fidelity & Guaranty Company, 302 So.2d 354 (La.App. 3rd Cir.1974). However, an insurer can avoid paying penalties and attorney's fees by unconditionally tendering the undisputed amount of the claim in cases where there is reasonable disagreement over the total amount owed. The offer of payment in exchange for a complete release of the insured's claim is not a tender within the contemplation of the statute. Burton v. Foret, supra; Fuselier v. Louisiana Farm Bureau Mutual Insurance Company, 458 So.2d 657 (La.App. 3rd Cir.1984). Recently, the Louisiana Supreme Court in McDill v. Utica Mutual Insurance Company, supra stated:
If the first three elements of the Hart test are satisfied and the insured has made a showing that the insurer will be liable for some general damages, the insurer must tender the reasonable amount which is due. This amount would be unconditionally tendered to the plaintiff not in settlement of the case, but to show their good faith in the matter and to comply with the duties imposed upon them under their contract of insurance with the insured. The amount that is due would be a figure over which reasonable minds could not differ. [475 So.2d at 1091-92]
In the instant case, the parties entered into the following stipulations:
1) That State Farm Insurance Company insured the Landry vehicle with uninsured motorist coverage with limits of $25,000.00 per person per accident;
2) That the Hughes vehicle was uninsured; and
3) That Wayne Landry entered a 1/3 contingent fee contract with his attorney.
State Farm argues that the negligence of Jacqueline Hughes was a contested fact and that the negligence of Deputy Blanchard was the sole cause of the accident. State Farm reasons, therefore, that the requirements of "satisfactory proof of loss" were not met and, as a result, State Farm was not arbitrary or capricious in failing to pay.
The record reflects that Deputy Blanchard signaled Jacqueline Hughes to stop her vehicle and that she failed to obey his directive. The record also reflects that Jacqueline Hughes was issued a citation pursuant *427 to LSA-R.S. 32:56 for failure to obey officer's traffic signal. The only evidence which tends to support State Farm's argument that Jacqueline Hughes was not at fault is the following statement made by Deputy Blanchard in his deposition:
Q. Do you know whether or not Ms. Hughes actually saw your first signal to stop? Did you talk to her about that?
A. I remember her making a comment that she saw me, but she said that I was waiving her on rather than stopping, trying to stop her.
The record, however, is devoid of any direct evidence substantiating why Ms. Hughes failed to obey Deputy Blanchard's signal. The trial judge found that if State Farm seriously believed that Jacqueline Hughes was not at fault in causing the accident and that the accident resulted solely from the negligence of Deputy Blanchard, State Farm should have made some effort to depose and/or subpoena her for trial. However, in his written reasons for judgment, the trial judge pointed out that:
The record reflects that December 15, 1983 the original petition was personally served on Gwendolyn Hughes at Rt. 1, Box 490, Hwy 308, Belle Rose, Louisiana 70341. After this initial service only two (2) efforts were made to obtain testimony from Jacqueline Hughes and her mother Gwendolyn Hughes. Both were efforts by attorney for the petitioner, Mr. William E. LeBlanc.
On October 7, 1985 Mr. LeBlanc's notices of deposition were returned unserved with the following notation, "Jacqueline Hughes and Gwendolyn Hughes Both lives in Apt Complex going to live in Donaldsonville, La." On June 18, 1986 Mr. LeBlanc's subpoena for Gwendolyn Hughes to testify at the June 27, 1986 trial returned with the notation "moved to Donaldsonville." Donaldsonville is not such a large place that State Farm could not have located Jacqueline Hughes. She was State Farm's main hope of placing the entire blame for the accident on Dty. Blanchard.
The Court is not convinced that Jacqueline Hughes ever afforded State Farm a good faith defense for not paying the uninsured motoris (sic) coverage. The record does not reflect that State Farm made any effort to secure Jacqueline Hughes' testimony. Nor did it attempt to subpoena Trooper Carpenter or the Acadian Ambulance Attendant.
We agree with the trial judge that State Farm is liable for penalties and attorney's fees for arbitrary and capricious refusal to pay plaintiff's claim.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Defendants are cast for all costs.
AFFIRMED.
NOTES
[1] At trial the parties entered into a stipulation that Wayne Landry waived any claims for his own personal injuries.
[2] On February 10, 1987, the Insurance Guaranty Insurance Corporation was substituted as a party defendant for American Druggist's Insurance Company, who had filed for liquidation.