705 So.2d 1246 (1998)
DUAL DRILLING COMPANY
v.
MILLS EQUIPMENT INVESTMENTS, INC., Travis Vollmering, Atlas Iron and Metal Company, Doyle Henderson, and Southern Scrap of Morgan City, Inc.
No. 97-CA-1010.
Court of Appeal of Louisiana, Fourth Circuit.
January 7, 1998.
*1248 Jack M. Alltmont, Raymond P. Ward, Edward S. Rapier, Jr., Sessions & Fishman, L.L.P., New Orleans, and Dale P. Martin, Lippman, Mahfouz & Martin, Morgan City, for Defendant/Appellant, Southern Scrap Recycling Morgan City, L.L.C.
D. Warren Ashy, Lafayette, for Defendants/Appellants, Travis Vollmering and Atlas Iron and Metal Company.
Charles M. Lanier, Jr., Patricia B. Judice, Christovich & Kearney, L.L.P., New Orleans, and Michael M. Christovich, G. Alex Weller, Deutsch, Kerrigan & Stiles, New Orleans, for Plaintiffs/Appellees, Dual Drilling Company and its Underwriters.
Before ARMSTRONG, PLOTKIN and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Dual Drilling Company (Dual) sued Mills Equipment Company (Mills), Travis Vollmering, Atlas Iron and Metal Company (Atlas), Doyle Henderson and Southern Scrap of Morgan City, Inc. (Southern) for damages arising from the loss of a cement package and P-tank belonging to Dual's Rig 25. Dual alleged that Mills, Vollmering, Atlas and Henderson (the partners) formed a partnership to acquire equipment for scrap value and, in furtherance of the partnership's goals purchased Dual's Rig 16 package, comprised of an engine room, cement room, pump room, P-tank skid, drill floor substructure, skid base and pony skid, for $125,000. Dual alleged that Southern, despite clear marking, cut up Dual's Rig 25 cement package and cement tank at the instructions of the partnership. Dual requested a jury trial.
Southern filed an answer and third party demand against Atlas seeking full indemnity and, alternatively, contribution. The partners filed declinatory exceptions of improper venue and lack of jurisdiction to the main and third party demands, which were denied.
Dual filed a supplemental and amending petition adding as plaintiffs its underwriters, Uni-Polaris Insurance Company, Ltd., Hafnia Insurance Company, Ltd., Qatar General Insurance and Reinsurance Company, Chancellor Insurance Company, Ltd., Sphere Drake Insurance PLC, Yorkshire Insurance Company, Ltd., Institute of London Underwriters, American Insurance Company, Fireman's Fund Insurance Companies, La Reunion Francaise, Underwriters at Lloyds of London, and American International Group (Underwriters) asserting the Underwriters's subrogation rights. Southern amended its third party demand against Atlas for full indemnity.
*1249 During trial, the court granted unopposed motions to dismiss Henderson and Mills.
Following bench trial, the trial court rendered judgment on 25 September 1996 in favor of Dual and against Vollmering, Atlas and Southern, solidarily, jointly and severally, in the amount of $395,843 with judicial interest from the date of judicial demand and court costs. Southern's motion for new trial and to amend judgment was denied on 3 October 1996. Following rendition of the trial court's judgment, Atlas filed a motion to make a third party demand against Transcontinental Insurance Company and Valley Forge Insurance Company, its primary and excess insurers respectively which the trial court denied.
Dual and its Underwriters filed a motion for new trial to include the Underwriters in the judgment, which motion was unopposed by Vollmering and Atlas, and for sanctions against Southern for opposing the motion. Southern withdrew its opposition to the motion for new trial, the motion was granted, and the motion for sanctions was dismissed as moot.
On 13 December 1996, the trial court rendered a final judgment awarding Dual and the Underwriters $395,843 plus judicial interest from judicial demand and court costs, and granting the third party demand of Southern against Atlas at Atlas's cost.
On 2 January 1997, Southern filed a petition for suspensive appeal and an appeal bond in the amount of $610,065. On 28 January 1996 Vollmering and Atlas filed a petition for devolutive appeal. The judgment on Southern's third party demand was not appealed.

STATEMENT OF FACTS
Vollmering testified that he was experienced in the field of purchasing used rigs, having previously purchased a dozen rigs, who of which were offshore platform rigs similar to Rig 16. Although in 1991 he was an employee and vice-president of Mills, he acted individually for his own account in the negotiations for purchase of Dual Rig 16, and neither Mills nor its co-owner, Sherry Mills, derived any income or benefit from the purchase of Rig 16. Atlas furnished the funds for the purchase. According to the agreement of 15 October 1990 between Jose L. Cardenas, as representative of Dual, and Vollmering, Dual Rig 16 was to be sold for scrap. The sale consisted of rig packages, engine room, cement room, pump room, P-tank skid, drill floor/substructure, skid base and pony skid, sold "as is, where is" for $125,000. Dual was to retain ownership of the Quarters Package, the derrick (complete with starting legs and storage baskets) and the two National Mud Pumps. The items as to which Dual retained ownership were to be removed and set out, on the board setting where the rig sat at that time, as part of the scrapping/salvage process at no cost to Dual. Dual stated that it had paid the rental charges through the end of October 1990 to cover salvage and scrap removal from the Tidex Yard in Amelia, Louisiana, where the rig was located, along with any additional yard space rental that might be required beyond that date. Vollmering identified the bill of sale dated 1 November 1990 by which Dual transferred to Atlas ownership in Dual Rig 16 and the equipment specified in the original agreement in consideration of $125,000 paid by Atlas. Vollmering testified that he and Atlas bought the rig for re-sale. The waste metal was sold to a number of scrap dealers, the major buyer being Southern. Vollmering identified an invitation for bids prepared by Dual, which described is some detail the items being offered for sale as part of Rig 16. Vollmering was interested in purchasing Rig 16 for scrap re-sale and spoke to Doyle Henderson, who actually promoted or borrowed the money to finance the purchase. Only Vollmering went to the Tidex yard to inspect Rig 16 prior to the purchase. Vollmering could not recall any other rigs having been in the Tidex yard on the three or four occasions when he inspected Rig 16 prior to agreeing to the sale, and recalled that Rig 16 was neatly stacked in the corner of the yard, all intact, although parts had been cannibalized. Specifically excluded from the purchase were Rig 16's living quarters, the derricks with starting legs, storage baskets and two pump packages. He knew he was buying only one pump package and one cement package. Vollmering admitted that during his negotiations with Dual, there *1250 was no indication by Dual's representative that any component part of Dual Rig 25 was for sale. Vollmering testified, after the trial court overruled a hearsay objection, that the rig as shown in Southern's Exhibit # 1 was pointed out to him by a Dual representative whom he did not name as the Rig 16 package that was then for sale. Vollmering testified that he took the picture prior to the sale. That photograph is the same building as shown on the left in Plaintiff's Exhibit 1(b), and described as the Dual Rig 25 cement package. Vollmering testified that he walked through the building and produced photographs showing that there were no numbers identifying it as Rig 25 and testified that there were no markings on the building that indicated that it did not form a part of the Rig 16 package. The Rig 25 building was similar in appearance to the building that was Rig 16 and, like Rig 16, looked to Vollmering like a piece of salvage. Like Rig 16, it had been cannibalized and equipment had been removed so that Vollmering described it as having been gutted. This was contradicted by the testimony of Dual's petroleum engineer, Khaled Farag, who testified that Rig 25 was not salvage, and that the rust that appears on the rig is of cosmetic importance only, since the portions of the edifice showing rust did not contact with the marine environment, but were areas that would be wedged between two other buildings when the rig would be in use. Vollmering testified that he believed Rig 25 was part of the Rig 16 package and in preparing his bid included the equipment pertaining to Rig 25. He was not surprised that the rig apparently contained more equipment than was listed on the sale proposal, and testified that there is always equipment that goes with the rig that is not so listed. The only items not included in the sale were those enumerated in the second paragraph of the contract.
Vollmering testified that he arranged with Southern to cut up Rig 16 and pay Vollmering for the scrap. In connection with that arrangement, Southern offered on 20 February 1990 and Atlas accepted on 21 February 1990 a contract that provides in pertinent part:
This will confirm our conversation between your representative [Vollmering] and the writer with reference to the Dual rigs located at the Tidewater Yard in Amelia, La.
... [Atlas] will be responsible for removing [retention items] from the rig. These items will include but not be limited to the following: cranes, mud pumps, derrick base, SCR unit and transformers, rotary skid, accumulator and choke manifold, generators and engines, P Tanks....
Southern Scrap will assist you by furnishing burners to cut the retention items loose, however, Southern Scrap is not responsible for the condition of those items. The burners assigned to this task will be working under your supervision and it will be your responsibility to supervise the burner's work and your complete responsibility to furnish whatever labor and equipment is necessary to remove and load the retention items....
All material left after the retention items are removed ... will become the property of Southern Scrap and we will pay [Atlas] $52.00 per gross (2240# ) ton for this material....
Southern Scrap will be responsible for cutting, loading, and transporting the material to be scrapped and shall furnish whatever personnel and equipment is necessary to accomplish this work.... [Emphasis added.]
Vollmering testified that when he went through the Tidex yard with Southern's representative, he pointed out Rig 25 as the first item to be cut, in his alleged belief that it was part of the Rig 16 package he had purchased. Vollmering marked those items that he believed to be salvageable "Do not Cut" and Southern was to cut and take away only the iron that could not be salvaged and resold. Vollmering denied that the words "Do not Cut" were written on Rig 25, and this testimony was supported by the photograph of Cement Package 25; however, Farag, testified that the photograph was taken prior to the markings, and that his notes dated 8 March 1991 show that Gary Reynaud and Mike Smith of Southern admitted to him that they were instructed to cut Dual Rig 25 and they had witnessed the fact that Rig 25 was *1251 clearly marked "Do Not Cut/Save" and that there were two X's painted on the Rig 25 package. According to Vollmering, he identified for Southern each item Southern was to cut for scrap, including the non-salvageable portions of Rigs 16 and 25.
Panos Georgiou, executive vice-president of Burnett & Company, formerly the Wetzel Company, testified that his company acted as an insurance wholesaler and worked with Dual's agents to help them place Dual's insurance. He identified Dual's package policy in force at the time of the incident that is the subject of this suit. Georgiou testified that Rig 25 was listed in Section 2 as insured property. Rig 25 was insured for a total of $11 million, subject to a $25,000 deductible. Dual retained its right to proceed for its deductible. Georgiou's company was responsible for collecting insurance proceeds from the Underwriters and passing the funds on to Dual's agent. The Underwriters appointed Steege, Kingston and Associates, Inc. as the adjusters to investigate the loss on their behalf. The Underwriters accepted Steege, Kingston's recommendation that the value of the loss was $370,843 plus subrogation costs already incurred of $7,298 and paid the insurance proceeds to Dual.
Khaled Farag testified that from 1986 through 1996 he was employed by Dual, and in 1990 was Dual's division engineer for the Gulf of Mexico. He holds a Bachelor of Science degree in petroleum engineering from Texas A & M University, and testified that he has designed two offshore rigs similar to Dual Rig 16 and Dual Rig 25. He also surveyed or estimated the value of rigs for the purpose of selling and buying offshore rigs. He had not had occasion to purchase cement packages, but had twice purchased used, refurbished P-tanks for Dual. Farag testified that he had extensive experience estimating the value of used equipment rigs. Because most rigs were built in the 1970s to early 1980s, most equipment involving these offshore rigs is used equipment. In his capacity as a division engineer and later as a senior project engineer involved in developing budgets, he evaluated the costs of refurbishment, modification, transportation and subsequent operation of those units for drilling services. He developed internal budgets for reactivation of drilling units and had to acquire ancillary services or components for which he prepared bids. His particular experience was with the capital value of rig components, but he had not bought cement packages or evaluated an existing cement package prior to 1990. His experience was in the identification of replacement cost to build a similar package to the same specifications of that cement package based on technical drawings, welding codes, regulatory and industry rules and regulations. Farag identified himself as an engineer, not an equipment broker. The Court recognized the fact that Farag's expertise relates to the replacement value of a rig such as Rig 25, and not to the value of Rig 25 as it existed in 1990.
Farag testified that Rig 25 was awarded a contract job for day work drilling operations with Texaco Exploration Company. At the time, Rig 25's components were located in another yard. In about March 1990, after completion of a job for Exxon, Rig 25 was loaded out for offshore operations and it was determined that there was insufficient area on the platform structure to accommodate all necessary modules. A decision was made, in conjunction with the platform's operator, to move Rig 25's cement package building to the Tidex yard. Tidex informed Dual that Rig 25 would be moved to the north side of Dual Rig 16, and it was moved to that location, about thirty feet from Rig 16, on 27 March 1990, three months after Dual offered Rig 16 for sale. Farag testified that Rig 25 was not for sale and that had it been offered for sale, he, as division engineer, would have had to have been put on notice before a rig component of this working rig was sold. He received no such notice.
He testified that he made weekly visits to the Tidex yard and saw Rig 16, Rig 25 and Rig 25's associated equipment, consisting of the swivel, spinner, valve and P-tank. The associated equipment was there until the point when the cutting and removal took place.
Farag testified that he first became aware that Rig 25 had been cut up on 7 March 1991 when he and drilling superintendent James Monnin arrived at the Tidex yard. He *1252 discussed the matter with Greg Reynaud and Mike Smith of Southern, who advised that they were acting at the direction of their supervisor, Mr. Hunter and admitted that the Rig 25 cement package had been clearly marked "Do Not Cut/Save XX."
Farag testified that Rigs 16 and 25 had several structural, dimensional and functional differences.
Farag testified that Rig 25 is presently operating for Texaco Exploration in West Delta 109, a subsequent project. Rig 25, before its cement package building was cut up by Southern, was viewed by Dual as the "pride of the fleet," a very highly valued rig because of its capacity and its functions, and the absence of the cement package takes away from its usefulness by about one third. When originally placed in the Tidex yard, Rig 25 was a functional module and could support fluid service and its intended design service. It had previously operated less than twelve months earlier for Exxon on Mississippi Canyon 311 and was described by Farag as a good piece of equipment, part of a rig that was of value to the company. Except for the fact that it was cut up, it would still have been working for Dual at the time of trial.
Farag testified that he had designed a tank approximately half the size of the destroyed cement package but otherwise to the same specifications in 1991 that cost $150,000.
After the loss of Rig 25's cement package building, Farag went to three vendors, provided them with drawings of Rig 25's cement package and specifications and asked them to provide bids on refurbishment and replacement. He prepared the bid request and reviewed the bid proposals based upon his experience as a petroleum engineer. Brian Dennis Goetsch of Steege, Kingston testified that he conducted the investigation, and obtained a bid and quotation package from Dual's risk management department. It was the adjuster's goal to restore Dual to pre-loss conditiona unit in a workable condition that was in a cold-stack state while protecting the Underwriters from liability for more than the fair market value of the converted equipment. Farag and Goetsch testified that in response to the request for bids, Dynamic Offshore Contractors, Inc. provided a bid of $307,874. Omega Service Industries, Inc. provided a total rework bid of $213,811 and a new cement package bid of $376,791. Redfox Companies provided a bid to modify the cement package for $351,239.73 and to replace it for $475,000. National Oilwell provided a bid for a P-500 Swivel for $64,296, a Varco Kelley Spinner for $26,790, an upper Kelley valve for $4,428 and a Halliburton pressure tank for $26,518. Steege, Kingston insurance adjustors submitted a preliminary report noting the proposals and suggesting a net reserve of $500,000 to cover the loss, representing $380,000 for replacement cement package and $123,000 to replace the swivel, spinner, valve and P-Tank. The Underwriters submitted a full and final net settlement to Dual of $370,843. Goetsch testified that he accepted the bids because Dual knew and had worked with the vendors in the past successfully to build other rig modules and components, and the vendors were known to the adjusters as people in the Gulf Coast region who enjoy a favorable reputation in their business. He accepted the new replacement cost for the equipment items because, based on his knowledge and six years' experience as a well site geologist working on-shore and off-shore in the Gulf Coast prior to becoming an adjuster, the swivel, kelly spinner and kelly valve were long-lived pieces of machinery that do not significantly depreciate in value. Because Dual's equipment was workable and stacked ready for assignment, it had not depreciated. The value assigned by the adjuster to the cement package, however, was based on the cost of a used refurbished unit equipped to equivalent operational status.
On cross-examination, Farag testified that he had not shopped the market for a "used cement package" because those packages in 1991 did not exist. There was a limited number of unitsonly 18 of the rigs having been built in the United Statesand, in his opinion, it would not have been possible to have acquired a used cement package. Prior to 1990, Dual had purchased a used cement package from Teledyne; however, by 1990-91, *1253 Teledyne was out of the platform rig business.
Alphonso Joseph Schahn, who has been involved in the scrap business for the last ten years, testified that he was aware of the proposed sale of Dual Rig 16, and had been in the Amelia yard on a daily or weekly basis throughout 1990 and 1991. Schahn had some interest in participating in the purchase of Rig 16, and showed the rig to Ray Biano. According to Schahn, Biano contacted "Travis" [Vollmering] in Houston concerning purchase of Rig 16. In March, 1991, Schahn noticed that Dual Rig 25 had been marked by James Monnin, who showed Schahn the markings on Rig 25, "Do Not Cut/Save." Monnin told him parts of Rig 25 were thus marked so that it would not be misidentified and cut along with Rig 16.
According to Schahn, when James Monnin came to the yard to mark the equipment that was not to be cut, Schahn saw Rig 16, Rig 25 and the associated equipment.
Schahn testified that subsequent to the sale of Rig 16 to Vollmering, when Southern's crane operator, "Mr. Gary", began cutting, he told Southern's "Mr. Gilly" that the building, part of Rig 25, was not supposed to be cut. He told Gilly he needed to shut this down and get Mr. Hunter. Gilly told Schahn not to worry about it and to go back to the rig on which Schahn was working, an unrelated Penrod rig. Mr. Gilly said he was working for Southern Scrap in cutting up Rig 25. Schahn testified that he was told Southern had bought both rigs. Schahn asked Gilly to call Bernie Hunter, because he could see that on both sides of Rig 25 were "Do Not Cut/Save" markings made in orange paint. Beneath each "Do Not Cut/Save" was an X. The words also appeared, but without an "X", inside the entrance to the Rig 25 building. Schahn testified that the Rig 25 building was in good shape, needing only to be swept, perhaps sandblasted and painted. He also saw a Halliburton unit in the building, but testified that the unit had been removed by the time the rig was cut. Schahn was not a Dual employee and testified that he was not offered compensation or reimbursement for his testimony.
Jose Cardenas testified that he was employed by Dual from 1984 to 1991, and served as Vice-President of Engineering and Operations Support in early 1990. In light of the softening market for drilling rigs and the unfavorable comparison of Rig 16 with other Dual rigs, in consultation with his peers at Dual he decided to sell Rig 16. Rig 16 was less marketable than Dual's other platform rigs because it had been designed specifically to fit a group of Exxon platforms fifteen to eighteen years earlier, and subsequent designs called for rig packages to be mounted at 90 degrees to the longitudinal supports, beams and platforms. Rig 16 mounted lengthwise for a longer length of the beams and therefore did not fit most of the platform packages owned or leased by other operators.
Cardenas negotiated the sale with Vollmering, and testified that he never offered to sell the Rig 25 cement package, and that, in fact, Rig 25 was never even considered for sale. It was an active component, one of Dual's better rigs in their fleet, and Dual was using it. Rig 25 was in good working condition. The cement package had come off a job and was in Dual's inventory, ready to go to work on another job whenever needed; the remainder of Rig 25 had gone to another job that had not needed a cement package and, for that reason, the Rig 25 cement package was retained in Dual's inventory.
Cardenas identified the bill of sale and offer for sale of Rig 16; although Dual had originally offered all of Rig 16 for sale, following negotiations with Vollmering, only those items listed in the letter signed by Vollmering were included in the sale. Cardenas met with Ray Biano, who was introduced as the local representative of Vollmering, Mills and Atlas, inspected the rig and equipment and went over the mechanical drawings to determine what comprised the purchased packages. This was done with specificity, because as part of the agreement Vollmering was required to cut up the pump package, remove the mud pumps, and return them to Dual.
While Cardenas was in the Tidex yard immediately prior to the sale, he saw other pieces of equipment that were not part of the *1254 sale: a 500 ton swivel, a Varco kelly spinner, an upper kelly valve, and a Halliburton P-tank, all in good working condition. If the cement package or equipment had been in bad condition, or needed repair, they would have gone to Dual's shop or to the original manufacturer's facility to establish what repairs were necessary. Such equipment would not have remained in the Tidex yard.
Cardenas received a phone call from Dual's representatives in Broussard that Rig 25's cement package had been mistakenly cut up and was subsequently advised that the associated equipment described above was missing. Within two hours, Cardenas contacted Vollmering, who told him he had no knowledge of the situation, and that he had not cut up or given instructions to cut up any component of Rig 25.
Gary Reynaud, Southern's crane operator at the time of the incident, testified that his boss, Earl Mire, directed him to a rig located in the left hand corner of the Tidex Amelia yard. He testified that he was not concerned with the rig's number. Reynaud was not provided any of the sales documents regarding the sale of Rig 16. He testified that he has no oilfield experience, and cannot identify a cement package. He was at the yard to assist the burners, Joseph Smith and Moses Hines, who were also Southern employees. Reynaud testified that he and the burners cut up Rig 25's cement package at Mire's direction, and that he had begun cutting up Rig 25 by the time Vollmering arrived at the yard. On cross-examination, Reynaud admitted that he scrapped Rig 25 not because it was located near Rig 16 but because his Southern supervisor told him to scrap it. Vollmering directed the removal of various pieces of equipment which Reynaud recalled were marked "Do Not Cut." These items were loaded by another company, ABL, and taken away. Reynaud denied having admitted that the Rig 25 cement package had been marked "Do Not Cut" and could not recall at trial whether, in fact, those words were marked on Rig 25. Neither did he recall the words on the P-tanks. When asked if he customarily cut up something marked "Do Not Cut," Reynaud testified, "Things change, okay," that things are marked for different reasons that may cease to be relevant, but that he doesn't "just cut what we want to cut."
Earl Mire, Southern's yard superintendent, testified that he visited the Amelia yard on a daily basis to check the scrap job. He denied that there were any markings on Rig 25, and did not notice any difference between Rigs 16 and 25. He also testified that Gilly and his men came to help with the burning operation after Rig 25 had been cut up. Mire testified that Mr. Hunter told him to cut up the building identified in these proceedings as Rig 25's cement package.
Bernie Hunter, who was vice-president and general manager of Southern at the time of the incident, testified that when he walked through the Amelia yard he saw no identifying marks on Rig 25. He was unable to discern any difference between Rig 16 and the Rig 25 cement package. He testified that under the Atlas/Southern contract, salvaged items were to be identified by and given to Vollmering at the site. Southern took possession of scrap prepared by Gilly and loaded into Southern trucks and brought to Southern's yard, making contractual payment for the scrap to Atlas. At no time did Southern take possession of any salvageable equipment.
The trial court admitted the deposition testimony of James Monnin over objection by defendants that the deponent was not qualified as an expert to give an opinion concerning the value of the lost equipment and cement package. The trial judge noted that Monnin testified from his own personal experience purchasing and attending auctions at which similar items were sold. Monnin testified that in early 1991 he was Dual's senior drilling superintendent, based in Broussard, Louisiana, overseeing rigs in the Gulf of Mexico and south Louisiana. He had been superintendent of both Rigs 16 and 25. Rig 16 was 15 years old in 1991 and was in poor condition; Rig 25, on the other hand, was newer, still working and in very good condition. Rig 25's cement package was also in good condition at that time, and was stacked until a job arose for it. It had not accompanied the remainder of Rig 25, which was on location on a center bay platform which did *1255 not have room for the cement package. Rig 25's cement package was not for sale. Dual was unable to obtain a job for Rig 16 and offered it for sale. After the sale to Atlas was agreed to, Monnin drove to the Tidex yard and painted in orange fluorescent paint "Do Not Cut" on each end of Dual 25's cement package. At that time, Southern was starting to rig up to scrap Rig 16. Schahn approached Monnin and was present when Monnin painted Rig 25's cement package.
Monnin returned to the yard in early March with Farag and Dual engineer David Goodwill. When they drove into the yard, Monnin noticed that Rig 25's cement package was gone. He then called Dual's manager in Broussard to advise the company of the damage. Monnin testified that based on his personal experience attending oilfield equipment auctions, the value of a cement package, new in 1991, like Rig 25's would be $600,000 to $700,000. He testified that the cement package for Rig 25 was in approximately 75% of new condition. A similarly used cement package would have cost, if it could have been located on the market, between $350,000 and $400,000. He estimated the cost of a new P-tank to be $25,000 or $30,000, and of a used tank in 1991 to be $15,000 to $20,000.
Robert Adler, Atlas president and chief executive officer, testified that Doyle Henderson put him in touch with Vollmering in connection with the purchase of Dual Rig 16. Atlas participated only as a financier, to obtain bank financing for the transaction. Atlas entered into the scrap contract with Southern, a company with which Atlas had done business several year earlier, in order to insure that Southern's payments would be made directly to Atlas and that it would thus receive funds to reimburse Atlas the money it had borrowed in connection with the sale. Adler denied having visited the Amelia yard or having directed or controlled Vollmering or Southern in determining what to cut and what not to cut. Neither Atlas nor Adler took possession of any of the equipment retained under the Southern/Atlas contract. Vollmering and Henderson took care of those items, but the money gained on the sale of the equipment was returned to Atlas.
Adler admitted that under the terms of the Bill of Sale, ownership of Rig 16 passed to Atlas upon its payment of the $125,000 purchase price. Everything that was cut up by Southern for scrap, including the Rig 25 cement package, was weighed and the agreed price was paid by Southern to Atlas. In addition, the proceeds from the sale of all equipment removed by Vollmering were paid to Atlas.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Our initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840, 844-845 (La. 1989). We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell, 650 So.2d at 745.
*1256 When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).

FINDINGS OF THE TRIAL COURT
The trial court found that Vollmering and Atlas purchased from Dual all ownership in Dual Rig 16. Subsequently, Vollmering engaged Southern to assist in the salvage of Rig 16. On or about 7 March 1991, defendants negligently cut up and converted a cement package and associated equipment from Dual Rig 25 which were not included in the sale of Rig 16. Vollmering and Southern's employees testified that all salvageable items were removed by Vollmering on behalf of Atlas and that Southern never took possession of these items. These conclusions are amply supported by the record below.
The trial court found that Dual and its Underwriters were entitled to replacement cost of Rig 25's cement package, a Halliburton P-tank, 500 ton swivel, kelley spinner and upper kelley valve. The cement package and equipment cannot be repaired or restored to Dual and the defendants offered no evidence of the value of the items before the loss. Thus, the trial court awarded the cost of replacement with a used, refurbished cement package building and new associated equipment, less reasonable depreciation. The trial court found abundant evidence supporting $273,811 as fair and reasonable replacement cost of the cement package and $26,518 for the P-tank; $64,296 for the 500 ton swivel; $26,790 for the kelley spinner and $4,428 for the upper kelley valve.
The trial court found defendants failed to meet their burden of showing a basis for depreciation, and that the evidence showed that the equipment was fully operational and in excellent condition.
The trial court accepted Schahn's testimony that he advised Southern's employees that the Rig 25 cement package was not part of the sale of Rig 16, and found that the cement package was marked "Do Not Cut." Therefore, the trial court found, Southern knew or should have known that Atlas was not the owner of the Rig 25 cement package.
SOUTHERN'S FIRST AND SECOND ASSIGNMENTS OF ERROR: The trial court erred in holding Southern liable without fault under the common law concept of conversion. Under Louisiana law, Southern can be liable only upon proof of fault; the trial court erred in concluding that Southern was not in good faith and knew or should have known that the RIG 25 cement package was not part of the property sold to Atlas, since Dual did not overcome the presumption of Southern's good faith.
While Southern argues that "conversion" is a common law concept that cannot be applied in Louisiana absent a finding of fault, we find that this argument is irrelevant under the facts of this case. The trial court accepted Schahn's testimony that he told Southern's employees that Rig 25's cement package was not part of Rig 16 and Monnin's testimony that he had marked the Rig 25 package with orange fluorescent paint, "Do Not Cut". That finding is sufficient basis for a finding of fault on the part of Southern. We also note that the contract between Southern and Atlas refers to Dual "rigs" in the plural, thus evidencing an understanding that Dual property other than just Rig 16 was in the Tidex yard.
The record also provides ample basis for the trial court's finding that Southern is liable under the Louisiana concept of conversion. In Louisiana State Bar Assn. v. Hinrichs, *1257 486 So.2d 116 (La.1986), Justice Dennis, a noted defender of Louisiana's civilian tradition, recognized that since the 1800's conversion in Louisiana has been limited to those major interferences with a chattel, or with a plaintiff's rights in it, which are serious and important, and in determining the seriousness of the interference, the courts consider the extent and duration of the defendant's exercise of control over the chattel, his intent to assert a right which is in fact inconsistent with plaintiff's right of control, the defendant's good faith or bad faith, the harm done to the chattel, the extent and duration of the interference with plaintiff's right of control and the expense and inconvenience caused to plaintiff. The Louisiana Supreme Court defined the intent required for a finding of conversion:
The intent required for a conversion is not necessarily that of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. A mistake of law or fact is no defense. Persons deal with the chattels or exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts. Hinrichs, 486 So.2d at 121.
Prudent action and good faith are not a defense to tortious conversion. Harper Oil Field Services v. Dugas, 451 So.2d 96, 101 (La.App. 3 Cir.1984).
The record clearly supports the conclusion that Southern was negligent and that Southern's interference was sufficiently serious to constitute conversion. These assignments of error are without merit.
SOUTHERN'S THIRD ASSIGNMENT OF ERROR: The trial court erred in failing to find Dual was itself at fault and is estopped from claiming liability against Southern.
The standard negligence analysis we employ in determining fault is the duty/risk analysis, which consists of the following four-prong inquiry:
"I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e. was it a cause-in-fact of the harm which occurred?
II. Did the defendant(s) owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?" Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 321-322.
There is no evidence of record that Dual breached a duty of care owing to Atlas and Southern. The trial court accepted Monnin's testimony that he marked the Rig 25 cement package "Do Not Cut", and accepted Schahn's testimony that he warned Southern's employees not to cut Rig 25. These credibility determinations are not manifestly erroneous and support the conclusion that Dual did not breach a duty to Atlas, Vollmering or Southern. This assignment of error is without merit.
SOUTHERN'S FOURTH AND EIGHTH ASSIGNMENTS OF ERROR and VOLLMERING AND ATLAS'S ASSIGNMENTS OF ERROR A AND B: The trial court erred in admitting evidence of quantum estimates/proposals, prepared for use in litigation, to replace the RIG 25 cement package or to refurbish a purportedly similar structure, and to replace the associated equipment because this evidence was inadmissible hearsay to which the business records exception does not apply; VOLLMERING AND ATLAS'S ASSIGNMENT OF ERROR C: The trial judge erred in allowing a lay witness to give opinion testimony.
As a general rule, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property to its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make *1258 the repairs, damages are measured only by the difference between the value of the property before and after the harm. Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Company, 618 So.2d 874, 879-80 (La.1993). The Louisiana Supreme Court emphasized that when the teachings of the jurisprudence and the Restatement (Second) of Torts sec. 929 are applied as flexible guides rather as arbitrary formulae, they tend to foster the same goals established by our Civil Code and state constitutional property damage principles, i.e., they tend to compensate the victim to the full extent of his loss and restore him to as good a position as he held prior to the damage. La.C.C. art. 2315; La. Const.1974, Art.I, sec. 4; Roman Catholic Church, 618 So.2d at 879.
The particular facts of this case particularly mandate the flexible approach described by the Louisiana Supreme Court and embraced by the trial court. Rig 25's cement package was negligently converted by Southern's employees acting under contract with Atlas. The testimony clearly establishes that this rig was one of only 18 of its type ever manufactured, and no general after-market exists from which a used replacement might be obtained. In a real sense, the rig's cement package in its pre-cut condition was irreplaceable. Our review of the entire record convinces us that the trial court made its determination of value based upon the best estimates available to it, and that the determination was not manifestly erroneous or clearly wrong.
We note that Dual's proof of loss was admitted into evidence in connection with Goetsch's testimony, and no objection was raised to its admissibility. Absent a contemporaneous objection, the admissibility of the proof of loss will not be considered on appeal.
The bid proposals themselves were accepted into evidence based on the testimony of the independent insurance adjuster, who was himself familiar with the type of equipment and structures involved and with the vendors making the bids, as well as on the testimony of Farag, the petroleum engineer who prepared the bid specifications. The trial court accepted Farag as an expert in replacement value of the converted equipment, and we find no abuse of discretion in that decision. See, La.C.E. art. 703. The authorities cited by appellants do not involve expert testimony based on cost estimates prepared by absent third parties and are inapposite.
Farag testified on cross-examination that preparation of bid specifications was part of his normal duties for Dual. Goetsch's testimony that Steege, Kingston obtained and reviewed the bids as part of its normal business operations lends further support for admissibility as Steege, Kingston business records. See, La.C.E. art. 803(6).
The trial court's admission of Monnin's testimony as to value does not constitute abuse of the trial court's broad discretion in administering La.C.E. art 701, which allows a lay witness to offer opinion evidence which is rationally based on the witness's perception and helpful to a clear understanding of his testimony or determination of a fact in issue. See, Comment (b) of 1988 to La.C.E. art. 701; Abbyad v. Mathes Group, 95-1543 (La.App. 4 Cir. 3/14/96), 671 So.2d 958. The accuracy of Monnin's opinion as a representative of the owner of the equipment is a matter for cross-examination, and goes to the weight, rather than to the admissibility, of the evidence. Louisiana Land and Exploration Co. v. Verdin, 95 2579 (La.App. 1 Cir. 9/27/96), 681 So.2d 63, 64-65, writ denied 96-2629 (La.12/13/96), 692 So.2d 1067, cert. denied, ___ U.S. ___, 117 S.Ct. 1696, 137 L.Ed.2d 822 (1997).
No countervailing evidence as to value was offered by Southern or Atlas. These assignments of error are without merit.
SOUTHERN'S FIFTH AND SIXTH ASSIGNMENTS OF ERROR: The trial court erred in granting recovery for the purported loss of associated equipment absent evidence that said equipment was at the job site at the time defendants arrived and performed demolition of the cement package or that Southern touched, handled, demolished or took the associated equipment.
*1259 This argument ignores the testimony of Farag, Cardenas and of the independent witness Schahn that all three had seen the associated equipment at the Tidex yard site prior to Southern's commencement of its scrap activity. Southern's reliance on two photographs that do not show the equipment in the Tidex yard is misplaced; Southern's crane operator, Reynaud, testified that one of the photographs was not representative of what the two rigs looked like when he began his cutting operation, and testified to "other things" that were present at that time.
We find that the record taken as a whole supports the trial court's determination that the associated equipment was present when Southern began its scrap and salvage operation. These assignments of error are without merit.
SOUTHERN'S SEVENTH ASSIGNMENT OF ERROR and VOLLMERING AND ATLAS'S ASSIGNMENT OF ERROR D: The trial court erred in assessing the value of the associated equipment based upon the cost of new equipment.
The trial court accepted Farag's testimony and the National Oilwell bid as to the value of the associated equipment items, finding the estimates to have been fair and reasonable. We will not disturb the trial court's evaluation of the witness's expertise and credibility. Neither Southern nor Atlas nor Vollmering presented admissible evidence to controvert the evidence adduced by Dual as to the value and availability of used equipment on the secondary market, or as to depreciation. Goetsch, the insurance adjuster who investigated the claim and whose interest lay in protecting the Underwriters from unnecessary expense in settling Dual's claim, testified that the machinery was simple and long-lived, and thus not subject to significant depreciation. Essentially, the equipment held its value so long as it was usable, and there is no credible evidence of record that it was not usable at the time of the conversion. We do not find the trial judge's evaluation of the associated equipment to be manifestly erroneous or clearly wrong. These assignments of error are without merit.
SOUTHERN'S NINTH ASSIGNMENT OF ERROR: The trial court erred in failing to find that the maximum loss for which Southern may be responsible is the value of the scrap metal from the cement package that Southern purchased and received, or 235 tons at $52 per ton.
Southern argues that because it was allegedly without fault, Dual should recover from Southern no more than the value of the scrap metal taken by Southern from Rig 25's cement package. Because we have found that Southern was at fault through its employees' disregard of both written and oral warnings not to cut the Rig 25 cement package, Southern's unjust enrichment argument is without merit.
SOUTHERN'S TENTH ALTERNATIVE ASSIGNMENT OF ERROR: In the event that Southern was properly found to have been at fault, the trial court erred in holding Southern liable in solido for 100% of Dual's damages. Fault should have been assigned to Dual and to each defendant pursuant to La.C.C. art. 2324; this fault assignment should not extend to the associated equipment.
By analogy to the review of awards of damages for personal injuries the trier of fact is owed some deference in allocating fault, for the finding of percentages of fault pursuant to the comparative fault article, La.C.C.art. 2323, is also a factual determination. The Louisiana Supreme Court noted the analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations and held that in both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. Only after the court of appeal finds a "clearly wrong" apportionment of fault, should it adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), pp. 7-8, 666 So.2d 607, 610-11.
Southern's employee Reynaud admitted the order to cut the Rig 25 package came from another Southern employee, Mire. There was credible evidence that even before *1260 Atlas's representative appeared at the job site, Rig 25's demolition had begun. As we have already noted in discussion of previous assignments of error, Southern's employees disregarded written and verbal warnings that Rig 25 was not a part of Rig 16 and was not to be cut.
Southern would assess Dual fault because the two rigs were located in close proximity to each other; however, Monnin's deposition establishes that it was Tidex that allocated the space where the rigs were to be stored. Reynaud testified that his crew cut Rig 25 not because of its location, but because Mire ordered him to do so. We have heretofore found that the trial court's finding that Southern was at fault and was not in good faith is adequately supported by credible evidence in the record when viewed as a whole. This assignment of error is without merit.

CONCLUSION AND DECREE
Our review of the record in its entirety convinces us that the trial court's findings are reasonable in light of that record. We conclude that the findings of fact are not manifestly erroneous or clearly wrong, and the application of legal principles reflected in the judgment is correct. Therefore, the judgment, as amended by the trial court and rendered on 13 December 1996, is affirmed.
AFFIRMED.
PLOTKIN, J., concurs in the result.
NOTES
[1] See, LSA-Const. Art. 5, section 10(B).